**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| EK VATHANA, individually and on behalf of all others similarly situated, *Plaintiff-Appellant*, v. EVERBANK, AKA EverBank Direct, AKA EverBank Federal Savings Association; EVERBANK FINANCIAL CORP.; EVERBANK WORLD MARKETS, *Defendants-Appellees*. | No. 12-15587 D.C. No. 5:09-cv-02338-RS OPINION |

Appeal from the United States District Court
for the Northern District of California
Richard Seeborg, District Judge, Presiding

Argued and Submitted
February 14, 2014—San Francisco, California

Filed October 31, 2014

Before: Alex Kozinski, Chief Judge, and Diarmuid F.
O'Scannlain and Mary H. Murguia, Circuit Judges.

Opinion by Judge Murguia

# SUMMARY[*]

## Florida Law

The panel affirmed in part and reversed in part the district court's summary judgment in favor of EverBank on a breach of contract claim brought by a certified class of Everbank customers who purchased EverBank WorldCurrency certificates of deposit denominated in Icelandic króna.

The class alleged that EverBank breached the terms and conditions of the WorldCurrency CDs by closing the WorldCurrency CDs without the class members' consent, and delivering the value of the closed CDs in U.S. dollars at the exchange rate that EverBank obtained in the wholesale market.

Under Florida law, the panel held that no reasonable jury could find that EverBank acted in bad faith when it exercised its discretion to close the WorldCurrency CDs to limit losses to itself or its customers. The panel also held that a reasonable jury could find that the terms and conditions were silent with respect to the currency conversion rate that applied when the WorldCurrency CDs were closed and the proceeds from the CDs returned to the class members. The panel reversed on this ground, and remanded to the district court to resolve whether EverBank breached the terms and conditions when it returned the value of the WorldCurrency CDs to the class members.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Michael Millen (argued), Law Office of Michael Millen, Los Gatos, California, for Plaintiff-Appellant.

Deborah S. Birnbach (argued), Goodwin Procter LLP, Boston, Massachusetts; Robert B. Bader, Goodwin Procter LLP, San Francisco, California; William M. Jay, Goodwin Procter LLP, Washington, D.C., for Defendants-Appellees.

**OPINION**

MURGUIA, Circuit Judge:

Ek Vathana and a certified class of EverBank customers purchased EverBank WorldCurrency certificates of deposit (CDs) denominated in Icelandic króna (ISK), which matured between October 8, 2008, and December 31, 2008. They appeal the district court's order granting summary judgment for EverBank on their breach of contract action. We have jurisdiction under 28 U.S.C. § 1291. We affirm in part and reverse in part.

**BACKGROUND**

**A.  EverBank's WorldCurrency CD**

Unlike traditional certificates of deposit, an EverBank WorldCurrency CD is denominated in foreign currency. This means that, in addition to earning interest, the principal itself may rise or fall in value over the maturity period of the CD, depending on the strength of the foreign currency relative to U.S. dollars.

When a customer opens a WorldCurrency CD, EverBank adds the customer's investment to its treasury and credits the customer's WorldCurrency CD in a foreign currency of the customer's choice. Under paragraph 2.7.1 of the terms and conditions applicable to the WorldCurrency CDs (the "Terms and Conditions"), the exchange rate that EverBank uses to convert the customer's initial investment into the foreign currency is a rate "within 1% of the wholesale spot price we pay for your currency." The "wholesale spot price" is the currency's price in the wholesale currency market when the customer opens the CD.[1]

This conversion occurs only as a book transaction: EverBank does not actually exchange the currency invested for the physical currency in which the CD is denominated. Instead, in separate transactions, EverBank purchases "forward contracts" to hedge the risks associated with its foreign currency liabilities to its WorldCurrency CD customers. The forward contracts allow EverBank to acquire a set amount of foreign currency on a specified date and at a set price, or exchange rate, that is based on the currency's wholesale spot price when EverBank purchases the contract. By entering into forward contracts for the foreign currency in its WorldCurrency CDs, EverBank is assured delivery of the currency from which to pay its customers on the date the CDs mature, should its customers choose to liquidate their investments. *Id.* The forward contracts protect EverBank

---

[1] The wholesale currency market is where financial institutions like EverBank trade large amounts of currency. By contrast, when an individual goes to a bank to exchange currency, he purchases currency in the retail market. The retail spot price available to an individual exchanging money at a bank can differ from the wholesale spot prices available to banks in the wholesale market.

from the risks of exchange rate fluctuation before the CDs' maturity dates.

Paragraph 2.7.10 of the Terms and Conditions sets out the WorldCurrency CD's renewal policies upon maturity. It provides in relevant part,

> **Renewal Policies:** Except as provided in the Lock-In Alternative section above, your WorldCurrency CD is automatically renewable; however, you may do one of the following options by providing instructions to the Trading Desk at least one week prior to the maturity date of the outstanding CD:
>
> > 1. liquidate your account upon maturity.
> >
> > 2. remove the interest and re-invest the principal.
> >
> > 3. roll over the CD proceeds (principal plus interest).
>
> If you choose to roll over the CD, it will be re-invested in the same currency for the same maturity, at the current prevailing interest rate.
>
> . . . .
>
> If we do not receive maturity instructions from you at least one week prior to maturity, your CD will automatically renew, reinvesting your principal and any interest into a CD of

the same currency and maturity, at the prevailing interest rate on the date of renewal.

## B. Lead Plaintiff Ek Vathana's WorldCurrency CDs and Iceland's Financial Crisis

On July 23, 2008, lead plaintiff Ek Vathana opened the first of two ISK-denominated WorldCurrency CDs that matured during the class period. The price of ISK when Vathana opened the CD was 78.65 ISK per U.S. dollar. *Id.* The value of the CD when Vathana opened it was 747,676.53 ISK, or $9,447.49. Vathana opened his second WorldCurrency CD on September 10, 2008. The exchange rate was 88.05 ISK per U.S. dollar, and the value of the CD was 3,547,501.93 ISK, or $40,040.07. Both of Vathana's WorldCurrency CDs had three-month maturities.

A month later, Iceland's financial system was in crisis. The Prime Minister addressed the nation on October 6, 2008, describing the "major difficulties" facing Iceland's banks, which had grown so rapidly before the recession that their liabilities were "many times Iceland's GNP." The Prime Minister warned the country that "[m]ajor credit lines to the banks have been closed and it was decided this morning to suspend trading with the banks and with the savings funds in the Icelandic Stock Exchange." The Icelandic government passed emergency legislation allowing it effectively to put Iceland's major banks into receivership. The Central Bank of Iceland imposed restrictions on the exchange of ISK into foreign currency.

Because of the crisis in Iceland, EverBank was unable to find any counterparties willing to offer forward contracts for ISK. Because it could not hedge the risk of offering

WorldCurrency CDs denominated in ISK going forward, EverBank decided not to roll over its ISK-denominated WorldCurrency CDs set to mature in early October 2008. *Id.* EverBank paid the proceeds of the matured CDs in U.S. dollars, calculating their value using the available wholesale spot price. *Id.*

In mid-October, EverBank was again unable to find anybody willing to enter into forward contracts for ISK. However, unlike the week before, it could not even find any parties willing to trade ISK for U.S. dollars on the wholesale market.

Vathana's first WorldCurrency CD matured on October 22, 2008. Two days before it matured, Vathana emailed EverBank, instructing it to roll over his CD. He wrote, "I will not accept a forced liquidation conversion. If you choose to close my accounts, I demand you send me the actual physical ISKs." *Id.*

In late October 2008, EverBank finally located a party willing to offer a ISK/Euro forward contract, on the basis of which EverBank could calculate a wholesale conversion rate for U.S. dollars. The exchange rate was about 253 ISK per U.S. dollar, dramatically worse than the 78.65 ISK per U.S. dollar rate at which Vathana opened the CD. *Id.* EverBank notified Vathana that it had closed his CD, converted the ISK to U.S. dollars at the 253 ISK per U.S. dollar rate, and deposited the proceeds, $2,958.03, into Vathana's account with EverBank. Vathana lost $6,489.46.

On December 10, 2008, EverBank closed Vathana's second WorldCurrency CD and returned the value of that account to Vathana in U.S. dollars at a slightly better

exchange rate of about 217 ISK per U.S. dollar. The rate was still significantly worse than the approximately 88 ISK per U.S. dollar rate at which he opened the CD. Vathana lost $23,700.88 on that CD.

EverBank did not renew or roll over any of its ISK-denominated WorldCurrency CDs maturing between October 8, 2008, and December 31, 2008. Instead, it closed the CDs on their maturity dates and returned the value of the CDs to its customers in U.S. dollars according to the rates that EverBank obtained in the wholesale market.

### C.  Proceedings Before the District Court

Vathana brought a class action for breach of contract against EverBank on behalf of all EverBank WorldCurrency CD customers whose ISK-denominated WorldCurrency CDs matured between October 8, 2008, and December 31, 2008. Vathana claims that EverBank breached the Terms and Conditions by (1) closing the WorldCurrency CDs without the class members' consent, and (2) delivering the value of the closed CDs in U.S. dollars at the exchange rate that EverBank obtained in the wholesale market. Vathana alleges that the Terms and Conditions required EverBank to automatically renew the CDs and did not specify a conversion rate that applied when the WorldCurrency CDs were closed and liquidated.

The parties twice moved for summary judgment. First, the parties cross-moved for summary judgment on Vathana's claim that EverBank breached the Terms and Conditions by paying the CDs' proceeds in U.S. dollars at the wholesale spot price. The district court granted summary judgment to EverBank on this claim, rejecting Vathana's argument that

the currency conversion rate in paragraph 2.7.1 of the Terms and Conditions, "within 1% of the wholesale spot price we pay for your currency," applies when the WorldCurrency CD is opened but does not clearly apply when the CD is closed. The district court agreed with EverBank that the conversion rate in paragraph 2.7.1 applies to all conversions applicable to the account, including when the account is opened and when it is closed.

Second, the parties each moved for summary judgment on whether EverBank breached the Terms and Conditions by unilaterally closing the CDs when they matured. The district court concluded that, although EverBank was ordinarily required under paragraph 2.7.10 of the Terms and Conditions to automatically renew the CD or honor the customer's instructions, EverBank was released from doing so under paragraph 1.17 of the Terms and Conditions. This paragraph provides that "if we [EverBank] believe that it is necessary to close your account immediately in order to limit losses by you or us, we may close your account prior to providing notice to you." Because the district court saw no factual dispute over whether EverBank closed the class members' accounts in good faith under this provision, the district court determined that EverBank had not breached the Terms and Conditions. The district court also disagreed with Vathana that EverBank's decision to close the accounts was an "amendment" to the CD's renewal policies set forth in paragraph 2.7.10. The district court therefore rejected Vathana's argument that EverBank violated the Truth in Savings Act by failing to notify the class members of the "amendment." Having concluded that Vathana could not prevail as a matter of law on either of his theories of breach, the district court entered judgment for EverBank. Vathana now appeals.

## DISCUSSION

We review de novo the district court's grant of summary judgment. *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The parties agree that the Terms and Conditions are governed by Florida law. Under Florida law, clear and unambiguous contract language may be interpreted as a matter of law. *Smith v. Shelton*, 970 So. 2d 450, 451 (Fla. Dist. Ct. App. 2007). Whether contract language is ambiguous is also a question of law. *Id.* A contract's wording is ambiguous if it is "reasonably susceptible to more than one interpretation." *Lambert v. Berkley S. Condo. Ass'n*, 680 So. 2d 588, 590 (Fla. Dist. Ct. App. 1996). If the wording is ambiguous, interpreting the contract involves a factual question and summary judgment is inappropriate. *Smith*, 970 So. 2d at 451.

### 1.  EverBank's Closure of the CDs at Maturity

We decide first whether EverBank breached the Terms and Conditions by unilaterally closing the class members' WorldCurrency CDs when they matured. The district court concluded that EverBank's decision to close the CDs was justified by paragraph 1.17, which provides, in relevant part, "[i]f we believe that it is necessary to close your account immediately in order to limit losses by you or us, we may close your account prior to providing notice to you."

Under Florida law, "where the terms of the contract afford a party substantial discretion to promote that party's self-interest, the duty to act in good faith nevertheless limits that party's ability to act capriciously." *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1097–98 (Fla. Dist. Ct. App. 1999). "Yet, the limit placed on a party's discretion is not great. . . . Unless no reasonable party . . . would have made the same discretionary decision . . . , it seems unlikely that [the party's] decision would violate the covenant of good faith." *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1291 (11th Cir. 2001) (alterations in original) (internal quotation marks omitted).

We agree with the district court that Vathana failed to introduce evidence sufficient for a reasonable jury to find that EverBank breached the Terms and Conditions by exercising its discretion under paragraph 1.17 in bad faith. Vathana's own expert testified that forward contracts for ISK were unavailable from October 2008 to December 2008. It is undisputed that, had EverBank rolled over the WorldCurrency CDs without entering into forward contracts, and had ISK continued to lose value, EverBank could have been exposed to up to $12 million in losses. It is also undisputed that, if EverBank had continued to offer ISK-denominated WorldCurrency CDs, it would have had to charge the CD-holders interest, rather than pay them interest.

In hindsight, EverBank liquidated the class members' WorldCurrency CDs when they were least valuable. The CDs would have regained value if EverBank had remained in the ISK market until Iceland's economy improved. But paragraph 1.17 gave EverBank discretion to close the WorldCurrency CDs immediately to limit its or its customers' losses – discretion that was limited only by EverBank's obligation

under Florida law to act in good faith. Vathana has not pointed to any facts demonstrating that no reasonable person would have made the same discretionary decision that EverBank made under the circumstances. *See Ernie Haire Ford*, 260 F.3d at 1291.

Vathana also argues that EverBank's decision not to renew the WorldCurrency CDs was a change to its renewal policy, and that its failure to disclose this change to the class members with sufficient notice violated federal law. Vathana relies on the Truth in Savings Act § 266 (TISA), 12 U.S.C. § 4305(c), which requires depository institutions like EverBank to notify its customers of any changes to its renewal policies 30 days before the changes come into effect. We agree with the district court that Vathana's TISA argument is unpersuasive.

TISA does not provide a private right of action to enforce its provisions. *See* 12 U.S.C. § 4309 (providing for administrative enforcement of TISA). But, even if it did, EverBank has always reserved the right to terminate any deposit account to limit losses: Paragraph 1.17 has always modified the automatic renewal policy in paragraph 2.7.10. Moreover, TISA does not provide that a bank's failure to give notice prevents the change from coming into effect, as Vathana contends. Vathana's unavailing TISA argument does not alter our conclusion that the district court properly held that Vathana failed to produce sufficient facts for a reasonable jury to find that EverBank acted in bad faith in closing the class members' CDs.

## 2. The Currency Conversion Rate

Vathana argues that paragraph 2.7.1 of the Terms and Conditions does not supply the currency conversion rate that applies when the WorldCurrency CDs are closed. According to Vathana, if paragraph 2.7.1 does not apply to an account's closing, then he and the rest of the class were entitled to payment in ISK, not U.S. dollars. While we do not address whether the plaintiffs were entitled to payment in ISK absent a contractual conversion rate, we disagree with the district court's conclusion that paragraph 2.7.1 unambiguously provides this rate. The Terms and Conditions could reasonably be interpreted as providing a currency conversion rate applicable only when a WorldCurrency CD is opened. Therefore, the district court erred in deciding as a matter of law that EverBank did not breach its agreement with the class members by converting the value of their CDs into U.S. dollars at a currency conversion rate within 1% of the wholesale spot price.

Paragraph 2.7.1 of the Terms and Conditions provides:

> **Conversion Information**: This account will be used to hold funds denominated in a currency other than U.S. dollars. If you request funds in this account to be denominated in a currency other than the currency sent to us to fund the account, we will convert your funds using a then current conversion rate set by us. Your currency conversion rate will be within 1% of the wholesale spot price we pay for your currency. Exceptions may occur when a

> specific conversion rate is agreed upon
> between you and us.

The district court acknowledged that reading paragraph 2.7.1 alone, the currency conversion rate "within 1% of the wholesale spot price we pay for your currency" appears only to apply when EverBank converts the customer's U.S. dollars into foreign currency to fund the account. The district court also recognized that paragraph 2.7.1 appears at the beginning of the section of the Terms and Conditions specifically applicable to the WorldCurrency CD, whereas provisions governing the withdrawal of funds from the CDs and the renewal of the CDs appear later, suggesting that the conversion rate in paragraph 2.7.1 applies only when the account is opened. *Id.*

However, the district court reasoned that, looking at the Terms and Conditions as a whole, paragraph 2.7.1 provides the WorldCurrency CDs' generally applicable, default conversion rate. The district court pinpointed the paragraph of the Terms and Conditions offering a "Lock-In Alternative" rate as conclusive evidence that the currency conversion rate in paragraph 2.7.1 otherwise applies to all conversions. Under that paragraph, the customer can contact EverBank at any point during the CD's maturity period to lock in an exit currency conversion rate for the CD rather than risk further fluctuations in the market before the CD matures. Because EverBank offers the customer this alternative exit currency conversion rate, the district court reasoned that the alternative rate must be "distinct from an otherwise understood currency conversion rate that is generally applicable to the account." Thus, the district court concluded that paragraph 2.7.1 necessarily provides the generally applicable conversion rate.

We agree with the district court that the Lock-In Alternative suggests that many customers might desire to have their balances converted into U.S. dollars upon maturity, and that it would therefore be reasonable for the Terms and Conditions to provide for a generally understood currency conversion rate. But we disagree that the Lock-In Alternative establishes as a matter of law that paragraph 2.7.1 provides that rate.

First, the structure of paragraph 2.7.1 strongly suggests that its conversion rate applies only when EverBank converts a customer's deposit to a foreign currency when the CD is opened. The paragraph begins by explaining that, if the customer "request[s] funds in this account to be denominated in a currency other than the currency sent to us to fund the account," EverBank will convert the customer's initial investment into foreign currency "using a then current conversion rate set by us." The sentence "[y]our currency conversion rate will be within 1% of the wholesale spot price we pay for your currency" immediately follows.

Second, the wording of the sentence "[y]our currency conversion rate will be within 1% of the wholesale spot price we pay for *your currency*" supports the interpretation that the currency conversion rate applies only when the account is opened, but not when it is closed, as EverBank only purchases foreign currency when the customer first opens the CD, and not when it closes the account.

Third, other references to currency conversion rates in the Terms and Conditions do not refer to a wholesale spot price or refer back to paragraph 2.7.1. For example, paragraph 2.7.8, which provides the penalties for early withdrawal, states that if the customer wishes to withdraw the value of the

WorldCurrency CD before it matures, the customer will pay an early withdrawal penalty and receive the value of the CD "converted to U.S. dollars at prices prevailing in the market at the time of early withdrawal, minus a conversion cost of up to 1.5%."

The Terms and Conditions do not unambiguously supply a currency conversion rate applicable when the WorldCurrency CD is closed. Thus, EverBank may have breached its agreement with the class members by returning the value of their WorldCurrency CDs using a currency conversion rate within 1% of the wholesale spot price. Because the Terms and Conditions are ambiguous, summary judgment for EverBank on this issue was inappropriate.

## CONCLUSION

No reasonable jury could find that EverBank acted in bad faith when it exercised its discretion to close the WorldCurrency CDs to limit losses to itself or its customers. However, we conclude that a reasonable jury could find that the Terms and Conditions are silent with respect to the currency conversion rate that applied when the WorldCurrency CDs were closed and the proceeds from the CDs returned to the class members. We reverse the district court's entry of summary judgment on this ground. We remand to the district court to resolve whether EverBank breached the Terms and Conditions when it returned the value of the WorldCurrency CDs to the class members.

Each party shall bear its own costs on appeal.

**AFFIRMED in part, REVERSED in part, and REMANDED.**